UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X

CAMICO MUTUAL INSURANCE COMPANY,

           Plaintiff,

  -against-

PASQUALE & BOWERS, LLP, MICHAEL G. D'AVIRRO,
CARL I. AUSTIN, JR., DAVID A. AYOUB, JAMES G.
BOWERS, GREGG A. GOETTEL, DONALD R. KIMBER,
AND GARY D. PETRICK

           Defendants.
------------------------------------------------------------------X

Summons Iss'd. (wl)
U.S. DISTRICT COURT
N.D. OF N.Y.
FILED

JAN 15 2004

$150. Pd

LAWRENCE K. BAERMAN, CLERK
ALBANY

Docket No.

**COMPLAINT**

04-CV-0046

**JURY TRIAL DEMANDED**

HGM / DEP

      Plaintiff, CAMICO MUTUAL INSURANCE COMPANY ("CAMICO" or "plaintiff"), by and through its attorneys, TRAUB EGLIN LIEBERMAN STRAUS LLP, as and for its Complaint for declaratory relief, sets forth and alleges the following:

### INTRODUCTION

      1.    This is an action for declaratory judgment pursuant to 28 U.S.C. §§2201-2202. Plaintiff CAMICO seeks this Court's ruling concerning the parties' respective rights and obligations under an insurance policy issued to Pasquale & Bowers, LLP, in connection with in a class action entitled <u>Thomas Denney, et al. v. Jenkens & Gilchrist, et al.</u>, Docket No. 03-CV5460 (SAS), pending in U.S. District Court for the Southern District of New York (hereinafter "the <u>Denney</u> action"). Pasquale & Bowers, LLP, including the individual defendants named herein, is referred to hereinafter as "P&B" or "the Insured."

      2.    An actual and justiciable controversy exists among the parties as to which a declaratory judgment setting forth their respective rights and obligations under the subject insurance policy is necessary and appropriate.

## JURISDICTION

3. Plaintiff CAMICO is a mutual insurance company that is not publicly traded and is organized and existing under the laws of the State of California with its principal place of business located at 1235 Radio Road, Redwood City, California 94065.

4. Defendant P&B was at all material times a limited liability partnership that provided certified public accountancy services and was organized and existing under the laws of the State of New York with its principal place of business at 129 North Salina Street, Syracuse, New York 13261. Effective January 1, 2003, P&B merged with another partnership that provides certified public accountancy services, currently known as Dermody, Burke & Brown, PLLC ("DBB"), located at 443 North Franklin Street, Syracuse, New York, 13204.

5. Defendant Michael G. D'Avirro resides at 135 Forrest Way, Camillus, New York 13031. Michael G. D'Avirro is domiciled in and is a citizen of the State of New York. At all material times Michael G. D'Avirro was a partner of P&B.

6. Defendant Carl I. Austin, Jr. resides at 6004 Singletree Lane, Jamesville, New York 13078. Carl I. Austin, Jr. is domiciled in and is a citizen of the State of New York. At all material times, Carl I. Austin, Jr. was a partner of P&B.

7. Defendant David A. Ayoub resides at 4587 Red Fox Drive, Manlius, New York 13104. David A. Ayoub is domiciled in and is a citizen of the State of New York. At all material times, David A. Ayoub was a partner of P&B.

8. Defendant James A. Bowers resides at 7354 Cedar Post Road, Liverpool, New York 13088. James A. Bowers is domiciled in and is a citizen of the State of New York. At all material times, James A. Bowers was a partner of P&B.

9.     Defendant Gregg A. Goettel resides at 6190 Carriage Shop Road, Cicero, New York 13039. Gregg A. Goettel is domiciled in and is a citizen of the State of New York. At all material times, Gregg A. Goettel was a partner of P&B.

10.    Defendant Donald R. Kimber resides at 5838 Independence Drive, Jamesville, New York 13078. Donald R. Kimber is domiciled in and is a citizen of the State of New York. At all material times, Donald R. Kimber was a partner of P&B.

11.    Defendant Gary D. Petrick resides at 111 Northwood Way, Camillus, New York 13031. Gary D. Petrick is domiciled in and is a citizen of the State of New York. At all material times, Gary D. Petrick was a partner of P&B.

12.    The individual defendants identified in paragraphs 5 through 11, above, are sometimes collectively referred to herein as the "individual P&B partners." P&B and the individual P&B partners are sometimes referred to collectively as "defendants."

13.    Each defendant either has its principal place of business in the State of New York, has otherwise done business in the State of New York or is domiciled in and is a citizen of the State of New York. The Court thus has personal jurisdiction over all defendants.

14.    No defendants are domiciled in or are citizens of the State of California. Plaintiff and defendants are, therefore, citizens of different states and this Court has original jurisdiction over this civil action based upon diversity of citizenship under 28 U.S.C. §1332(a)(1).

15.    The amount in controversy exceeds the sum of $75,000, exclusive of interest and costs.

3

## VENUE

16.     Plaintiff CAMICO seeks a declaration of the parties' respective rights and obligations with respect to insurance coverage for the Insured in connection with the <u>Denney</u> action. The <u>Denney</u> action, as it concerns the Insured, arises out of certain alleged acts or omissions that occurred beginning in or about September 1999, in or around Syracuse, Onondaga County, New York.

17.     Venue in this District is proper, pursuant to 28 U.S.C. §1391(a)(2), as a substantial part of the events or omissions giving rise to the asserted claim took place in this District.

## NATURE OF CONTROVERSY

**The Policy**

18.     CAMICO insured P&B under Accountants Professional Liability Insurance Policy No. NYL00046-02 originally issued for the August 14, 2000 to August 14, 2001 time period and thereafter renewed for two additional annual periods comprising the August 14, 2001 to August 14, 2002 and the August 14, 2002 to August 14, 2003 time periods. A copy of Policy No. NYL00046-02 (hereinafter "the Policy") is annexed hereto as Exhibit A.

19.     The Policy provides coverage on a claims made and reported basis, with a retroactive date of July 7, 1977. The policy was cancelled, at P&B's request, effective January 1, 2003.

20.     Pursuant to §III.A. of the Policy, coverage can be triggered when the insured first becomes aware of a Potential Claim under the following circumstances (with emphasis supplied in the Policy):

> If the *Named Insured* first becomes aware of a *Potential Claim* during the *Policy Period* and provides the Company with written notice as described in Section VI. Policy Conditions, A.1., then any *Claim* that may be made later against an *Insured* arising from those acts, errors

or omissions will be deemed reported to the Company on the date the Company received the written notice of the *Potential Claim*.

No Claim shall be deemed first made against an *Insured* during the *Policy Period* if any *Insured* reported that *Claim* as a *Claim* or *Potential Claim* to the Company or to any other professional liability insurer, or if that *Claim* or *Potential Claim* was known to any *Insured*, before the effective date of the *Policy Period*. If any *Insured* becomes aware of a *Claim* during the *Policy Period* and reports that *Claim* to the Company within 30 days of the date of expiration of that *Policy Period*, that *Claim* shall be deemed reported to the Company on the last day of that *Policy Period*.

21. Pursuant to §I.(1) of the Policy, a Potential Claim is defined, in pertinent part, as "an event or circumstances that any *Insured* would have a basis to reasonably anticipate may result in a *Claim*." (Emphasis in the Policy).

22. Pursuant to §VI.A. of the Policy, it is a condition precedent to coverage that the insured "promptly" provide to CAMICO notice of any Claim or Potential Claim concerning the insured's alleged acts and/or omissions. This condition precedent reads as follows, with emphasis in the Policy:

>   1.   As a condition precedent to coverage, an *Insured* must promptly notify the Company or its authorized representative of any *Claim* or *Potential Claim*, and include the following information, if available:
>
>        (a)   The name and address of the claimant or potential claimant, and all other involved individuals;
>
>        (b)   A description of the *Professional Services* provided, or that should have been provided, and the *Damages* that may result;
>
>        (c)   The *Insured's* explanation of why the *Claim* was made or why the *Potential Claim* may become a *Claim*.

**The Denney Action**

23. The defendants in the Denney action comprise P&B and certain other entities allegedly involved in establishing, promoting, marketing and/or referring the Denney plaintiffs to certain tax avoidance strategies that were disallowed by the U.S. Internal Revenue Service ("IRS").

24. The underlying tax avoidance strategies were deemed improper because they utilized inflated basis values for certain currency instruments purchased by the Denney plaintiffs. These instruments were expected to and did lose essentially all their "value," thereby creating artificial losses the Denney plaintiffs used to offset income on their respective income tax returns.

25. The Denney plaintiffs seek damages based on P&B's alleged involvement in evaluating, analyzing, marketing, advising and providing recommendations concerning the Denney plaintiffs' participation in the tax avoidance strategies.

26. The complaint in the Denney action contains causes of action based on alleged violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO") [18 U.S.C. §1962(a), *et seq.*], fraud, negligent misrepresentation, professional malpractice, civil conspiracy, unethical/illegal/excessive fees, unjust enrichment and breaches of contract, fiduciary duty and the duty of good faith and fair dealing in connection with the illegal tax avoidance strategies.

**Facts Common To All Counts**

27. Upon information and belief, in early 1999, certain individual P&B partners met with a partner of the accounting firm BDO Seidman at the Insured's offices in Syracuse, New York. The purpose of the meeting was to enlist P&B to market the tax avoidance strategies to its clients and others.

28. Upon information and belief, beginning in the second half of 1999 and continuing through 2001, the Insured analyzed, evaluated and recommended the tax avoidance strategies to certain P&B clients and to some non-clients.

29. Certain individuals for whom the Insured analyzed, evaluated and made recommendations to participate in the tax avoidance strategies, including but not limited to the Denney plaintiffs, invested therein during the 1999, 2000 and/or 2001 calendar years.

30. The individual P&B partners also personally invested in the tax avoidance strategies during certain years.

31. Beginning on or about December 27, 1999, with the issuance of Notice 1999-59, entitled "Tax Avoidance Using Distribution of Encumbered Property," the IRS publicly announced an initiative to disallow artificial losses for purposes of deductions on federal income tax returns. Notice 1999-59 stated, *inter alia*, that losses arising from transactions lacking in "economic substance" would not be allowed for purposes of offsetting income on tax returns.

32. The Denney plaintiffs allege that the Insured knew or should have known when Notice 1999-59 was issued that the IRS would assert that losses from the tax avoidance strategies were improper and that the Insured purposely failed to discuss the effect and significance of Notice 1999-59 with the Denney plaintiffs.

33. In or about March, 2000, the American Institute of Certified Public Accountants ("AICPA"), a national organization of the certified public accounting profession, posted on its website a "Tax News" bulletin alerting the profession to IRS Notice 1999-59 and to IRS's initiative to disallow designated transactions as improper tax shelters.

34. On or about September 5, 2000, IRS published Notice 2000-44, entitled "Tax Avoidance Using Artificially High Basis," which specifically warned against using "similar transactions [to those described in Notice 1999-59] that purport to generate tax losses for taxpayers."

35. Upon information and belief, Notice 2000-44 specified the same tax avoidance strategies P&B evaluated, analyzed and marketed to the Denney plaintiffs and other P&B clients. Notice 2000-44 stated that "[t]he purported losses from these transactions (and from any similar arrangements designed to produce non-economic tax losses by artificially overstating basis in partnership interest are not allowable as deductions for Federal income tax purposes."

36. Upon information and belief, P&B did not inform the Denney plaintiffs about IRS Notice 2000-44.

37. On or about January 12, 2001, the law firm of Jenkens & Gilchrist, a defendant in the Denney action, wrote an opinion letter to investors of the tax avoidance strategies regarding the effect of IRS Notice 2000-44 on the strategies promoted by BDO Seidman. Each of the individual P&B partners, having personally invested in tax avoidance strategies sponsored by BDO Seidman, was sent a copy of the Jenkens & Gilchrist letter.

38. On or about December 21, 2001, the IRS began a well-publicized 120-day "window of opportunity" for taxpayers to voluntarily disclose improper tax avoidance strategies on their federal income tax returns.

39. On or about January 14, 2002, the IRS commenced a program offering possible waivers of certain accuracy-related penalties pursuant to IRS Announcement 2002-2, entitled "Disclosure Initiative for Certain Transactions Resulting in Waiver of Certain Penalties Under

§6662 of the Internal Revenue Code," for taxpayers who disclosed participation in the illegal tax avoidance strategies..

40. On or about February 28, 2002, BDO Seidman wrote to all its clients, including the Denney plaintiffs and the individual P&B partners, and advised the clients of the IRS amnesty program and the details of IRS Announcement 2002-2.

41. The February 28, 2002, BDO Seidman letter stated, *inter alia*, that "[i]t appears that making the voluntary disclosure will likely cause a taxpayer's tax return to be subject to IRS scrutiny. Given the aggressiveness with which the IRS is seeking information about taxpayers who participated in tax shelter activities, it is reasonable to assume that such scrutiny will occur in this case."

42. In or about, March, May and July 2002, bills aimed at curbing a broad range of "abusive tax shelter transactions" were introduced in the U.S. Congress and proposed revisions to related tax regulations were publicized.

43. The Denney plaintiffs contend that, as a result of IRS Notice 1999-59 and Notice 2000-44, P&B knew or should have known at the time Cantley & Sedacca issued an April 8, 2002 opinion letter that the IRS would disallow the purported losses stated on plaintiffs' income tax returns.

44. Upon information and belief, on or about April 26, 2002, the IRS served upon certain P&B clients an Information and Document Request seeking materials pertaining to the clients' participation in the subject tax avoidance strategies.

45. Upon information and belief, in or about the Spring of 2002, P&B referred clients who invested in the tax avoidance strategies to a Texas attorney, Todd Welty, who would represent

their respective interests in responding to expected IRS challenges to tax deductions claimed from participation in the tax avoidance strategies.

46.     On or about July 9, 2002, the U.S. Department of Justice filed an action entitled <u>IRS v. BDO Seidman</u>, Case No. 02C4822, in the U.S. District Court for the Eastern District of Illinois seeking, *inter alia*, information concerning BDO Seidman's marketing of the tax avoidance strategies.

47.     On or about July 17, 2002, the IRS served upon certain P&B clients an Information and Document Request for documents pertaining to deductions claimed on tax returns for professional fees charged by Jenkens & Gilchrist and BDO Seidman with respect to the subject tax avoidance strategies.

48.     On or about July 29, 2002, Jenkens & Gilchrist wrote to clients, including the <u>Denney</u> plaintiffs and the individual P&B partners, advising that the IRS was seeking Jenkens & Gilchrist's client list for the tax avoidance strategies. The letter further stated "[t]he IRS recently filed enforcement actions against accounting firms KPMG and BDO Seidman for information on any clients that may have engaged in transactions that the IRS characterizes as 'abusive tax shelters.' The IRS seeks to identify clients so it can initiate audits of those clients. When KPMG gave the IRS the names of its clients, the IRS publicized those names as part of the lawsuit."

49.     Upon information and belief, in or about September and/or October, 2002, the individual P&B partners began receiving audit notices from State of New York tax authorities with respect to the individual P&B partners' respective income tax returns.

50. Upon information and belief, in or about mid-October, 2002, the Insured consulted legal counsel who advised the Insured that the individual P&B partners could face liability for penalties with respect to illegal deductions from paper losses related to the tax avoidance strategies.

51. Upon information and belief, P&B convened a partnership meeting in or about mid-October, 2002, attended by each of the individual P&B partners, to discuss, *inter alia*, issues arising from illegalities in the tax avoidance strategies. At this meeting, the individual P&B partners made the collective decision: (i) to amend their respective New York State and federal personal income tax returns to withdraw deductions based on losses attributed to the tax avoidance strategies; and (ii) not to tell the Insured's clients who invested in the tax avoidance strategies, including the <u>Denney</u> plaintiffs, about the individual P&B partners' decision to amend their respective income tax returns.

52. Each of the individual P&B partners amended their respective income tax returns and specifically stated therein that the amendments were made to comply with IRS Notice 2000-44.

53. On or about October 22, 2002, BDO Seidman wrote to the <u>Denney</u> plaintiffs and other P&B clients who participated in the tax avoidance strategies to advise that IRS was investigating the transactions and that BDO Seidman had been ordered to produce documents to the IRS.

54. On or about November 18, 2002, the State of New York State implemented a tax amnesty program similar to the IRS program initiated in December, 2001. The individual P&B partners who had invested in the tax avoidance strategies elected to take advantage of the tax amnesty program and filed amended tax returns with the State of New York.

55.     The facts and circumstances surrounding the tax avoidance strategies, not all of which are set forth in paragraphs "23" through "54," above, establish that the Insured knew or should have reasonably anticipated that such facts and circumstances could result in a claim against the Insureds.

56.     The Insured failed to notify CAMICO of the potential claim until on or about December 24, 2002. This was just eight (8) days before the Insured cancelled the Policy effective January 1, 2003.

57.     In correspondence dated June 5, 2003, CAMICO issued a letter to P&B reserving CAMICO's rights on various grounds, including the Insureds' failure to provide timely notice in compliance with the requirements of the Policy.

58.     CAMICO investigated the underlying facts and circumstances and denied coverage in correspondence to the Insured dated October 22, 2003. The principal basis for the coverage denial was the Insured's failure to timely notify CAMICO of facts and circumstances comprising the potential claim that resulted in the Denney action.

## FIRST CAUSE OF ACTION

**(Declaratory Judgment Against All Defendants - Late Notice)**

59.     Plaintiff repeats and realleges each and every allegation set forth in paragraphs "1" through "58" of this Complaint as if fully set forth herein.

60.     The underlying facts and circumstances, including but not limited to those summarized in the preceding paragraphs, provided a basis beginning at or around the time the IRS issued Notice 1999-59 and continuing throughout the aggressive and highly publicized IRS initiative to identify improper tax shelters and those who participated in them, for the Insured to reasonably anticipate a claim.

61.     Despite these circumstances, the Insured did not provide notice of the potential claim to CAMICO until on or about December 24, 2002. This did not constitute prompt notice of a potential claim under the surrounding circumstances, as required by the Policy.

62.     The Insureds' failure to promptly notify CAMICO of the underlying events and circumstances comprising the potential claim, as set forth in this Complaint, constitutes a breach of the notice condition and serves to vitiate coverage under the Policy.

63.     By reason of the foregoing, CAMICO is not obligated to defend or indemnify the Insured in the Denney action.

## SECOND CAUSE OF ACTION

### (Declaratory Judgment Against All Defendants – Intentional Misconduct)

64.     Plaintiff repeats and realleges each and every allegation set forth in paragraphs "1" through "63" of this Complaint as if fully set forth herein.

65.     Pursuant to §IV.(a) of the Policy, coverage is excluded as follows (with emphasis in the Policy):

> This policy does not apply to:
>
> *     *     *
>
> (a)     **Intentional Misconduct:** Any *Claim* based on or arising out of a dishonest, fraudulent, malicious or criminal act, error or omission of any *Insured*. The Company will defend, but not indemnify, any *Claim* alleging an *Insured* participated, aided or abetted in a civil conspiracy.

65.     Plaintiffs in the Denney action seek damages based on, *inter alia*, P&B's alleged violations of the Racketeer Influenced and Corrupt Organizations Act, fraud and conspiracy. The

allegations in support of these claims are based on alleged intentional misconduct on the part of the Insured, among others.

66. Pursuant to §IV.(a) of the Policy, CAMICO has no obligation to defend or indemnify any Insured with respect to any causes of action in the <u>Denney</u> complaint that are based on or arise out of dishonest, fraudulent, malicious or criminal acts and has no duty to indemnify any Insured for claims in the <u>Denney</u> complaint alleging any Insured's participation in a civil conspiracy.

### THIRD CAUSE OF ACTION

**(Declaratory Judgment Against All Defendants – Punitive Damages and Reimbursement of Fees)**

67. Plaintiff repeats and realleges each and every allegation set forth in paragraphs "1" through "66" of this Complaint as if fully set forth herein.

68. Pursuant to §III of the Policy, CAMICO will pay "sums that an Insured becomes legally obligated to pay as Damages because of a Claim arising out of the Insured's negligent act, error or omission in rendering or failing to render Professional Services.

69. The term "Damages" is defined in §I.(e) of the Policy as follows (with emphasis in the Policy):

>   (e) *Damages* means a monetary judgment, award or sums paid in settlement, but does not include: (1) any fine, sanction, penalty, or punitive or exemplary damages; (2) reimbursement of any *Insured's* fees for *Professional Services*; or (3) *Claim Expenses*.

70. Pursuant to the foregoing definition, CAMICO is not obligated to pay any judgments, awards or sums for, *inter alia*, penalties or punitive or exemplary damages (see §I.(e)(1)), or for reimbursement of any Insured's fees for professional services (see §I.(e)(2)).

71. Pursuant to §IV.(g) of the Policy, coverage is specifically excluded for claims seeking the return of any Insured's fees and, pursuant to §IV.(h), coverage is specifically excluded for any punitive or exemplary damages, fines, sanctions or penalties.

72. Certain causes of action in the Denney complaint seek recovery of penalties, punitive and/or exemplary damages from P&B. This includes, but is not necessarily limited to, the First Claim, Second Claim, Third Claim, Fourth Claim, Sixth Claim, Seventh Claim, Eighth Claim, Ninth Claim, Eleventh Claim, Twelfth Claim and Fourteenth Claim in the Denney complaint.

73. CAMICO is not obligated to indemnify any of the Insureds for any monetary judgment, award or settlement sums relating to claims for penalties, punitive or exemplary damages alleged in the Denney complaint, including but not limited to such amounts sought in the individual Claims, as set forth in the immediately preceding paragraph.

74. Certain causes of action in the Denney complaint seek the return of fees for professional services rendered by the Insureds. This includes, but is not necessarily limited to the Fifth Claim, Eighth Claim, Twelfth Claim and Thirteenth Claim in the Denney complaint.

75. CAMICO is not obligated to pay or provide reimbursement for any amounts comprising the return of fees for professional services, as alleged in the Denney complaint, including but not limited to such amounts sought in the individual Claims, as set forth in the immediately preceding paragraph.

**WHEREFORE**, CAMICO demands judgment as follows:

a. As to First Cause of Action: The Insured breached a condition precedent to coverage by failing to provide timely notice of the potential claim and, as a result, CAMICO has no duty to

defend or indemnify the Insured under Policy No. NYL0046-02 in connection with the <u>Denney</u> action;

  b. As to the Second Cause of Action: CAMICO has no obligation to provide defense or indemnification for any Claims in the <u>Denney</u> complaint that are based on or arise out of dishonest, fraudulent, malicious or criminal acts and has no duty to provide indemnity for any Claims in the <u>Denney</u> complaint alleging any Insured's participation in a civil conspiracy; and

  c. As to the Third Cause of Action: CAMICO has no obligation to pay any money judgment, award or sums paid in settlement relating to any fine sanction, penalty, or punitive or exemplary damages, or to reimbursement any Insured's for fees for professional services, as specifically demanded by plaintiffs in the <u>Denney</u> action.

Dated: Hawthorne, New York
   January 14, 2004

             Respectfully submitted,

             TRAUB EGLIN LIEBERMAN STRAUS LLP

             By: _____
               Stephen D. Straus (SS6183)
               Mid-Westchester Executive Park
               Seven Skyline Drive
               Hawthorne, New York 10532
               (914) 347-2600

               Attorneys for Plaintiff
               CAMICO Mutual Insurance Company